Filed 11/27/23  P. v. Perry CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B314950 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA150355) |
| v. | |
| LARRY EUGENE PERRY, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Appellant. | (No change in the appellate judgment) |

THE COURT:

It is ordered that the opinion filed herein on November 3, 2023 be modified as follows:

1.      The following language shall be inserted as the last sentence to footnote 10 on page 32:

> Because the record on appeal is devoid of affirmative
> evidence that defense counsel had no conceivable

tactical purpose for not objecting, Perry's additional claim that the failure to object constituted ineffective assistance is more appropriately made in a petition for habeas corpus. (See *People v. Lopez* (2008) 42 Cal.4th 960, 972; *People v. Avena* (1996) 13 Cal.4th 394, 419.)

There is no change in the appellate judgment. Appellant's petition for rehearing is denied.

_____

SEGAL, Acting P. J.    MARTINEZ, J.    PERLUSS, J. (assigned)

Filed 11/3/23  P. v. Perry CA2/7 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LARRY EUGENE PERRY,<br><br>    Defendant and Appellant. | B314950<br><br>(Los Angeles County<br>Super. Ct. No. TA150355) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Ricardo R. Ocampo, Judge.  Affirmed in part, vacating sentence with directions.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, and Thomas C. Hsieh, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted Larry Eugene Perry of forcible rape of a minor 14 years old or older (Pen. Code, § 261, subd. (a)(2)) and sexual penetration by a foreign object of a minor 14 years old or older (§ 289, subd. (a)(1)(C)).[1]  The victim was his daughter S.P. On appeal, Perry raises several arguments.  First, he contends the trial court erred under *Miranda v. Arizona* (1966) 34 U.S. 436 (*Miranda*) by admitting a recording of his police interrogation. Second, according to Perry, the court should have excluded the victim's pretrial statements offered at trial.  Third, he maintains the prosecution committed prejudicial error during its rebuttal closing argument by suggesting to the jury the defense strategically withheld certain recordings the prosecution had successfully excluded.  Fourth, Perry argues his case should be remanded for resentencing under amended section 1170, subdivision (b).

The convictions are affirmed, but we vacate the sentence and remand for resentencing based on amended section 1170, subdivision (b).

# FACTUAL AND PROCEDURAL HISTORY

A.    *The Information*

In December 2019 the People filed a three-count information against Perry, alleging the following charges: continuous sexual abuse of a minor under 14 years old in

---

[1]    Statutory references are to the Penal Code unless otherwise noted.

violation of section 288.5, subdivision (a) (count 1), sexual penetration by a foreign object of a minor 14 years old or older in violation of section 289, subdivision (a)(1)(C) (count 2), and forcible rape of a minor 14 years old or older in violation of section 261, subdivision (a)(2) (count 3).[2]

B.    *Prosecution Evidence*
1.    *Perry's Adult Daughter, Nakeya Perry, Takes Custody of S.P. and Perry Has Regular Visits with S.P.*

The information alleged the victim was S.P., Perry's minor daughter.  S.P. was born in August 2003 and was 17 years old at trial.  Perry's adult daughter Nakeya Perry, S.P.'s guardian, was 36 years old at trial.

Nakeya testified she first met Perry when she was 23 years old, and he informed her she had a younger half-sister, S.P.  Nakeya gained custody of S.P. when she was 11 or 12 years old, at Perry's request, after S.P.'s mother died and S.P. was in foster care.  S.P. had a learning disability and received special education services in elementary and middle school, but was in regular classes by high school.  Perry retained parental rights and had his disability benefits go to Nakeya for S.P.'s benefit.

Perry and S.P. first met when S.P. was 11 years old and Perry was living at a homeless shelter.  He subsequently moved into senior housing.  Starting around sixth grade, when she was 12 years old, S.P. stayed alone with Perry at his apartment from

---

[2]    The People additionally alleged, as to counts 1 and 3, that Perry had a prior serious felony conviction constituting a "strike." (§§ 667, subd. (a)(1), (d), 1170.12, subd. (b).)  The trial court granted the prosecutor's motion to dismiss the prior conviction allegations.

3

3:15 p.m. to 8:00 p.m. after school, as well as some weekends. This arrangement continued until December 2017, when S.P., then 14 and in eighth grade, told Nakeya that Perry was sexually abusing her.

2. *Perry Sexually Abuses S.P.*

S.P. testified that, when she was 12 years old and visiting Perry, he directed her to take down her pants and underwear and get on the bed. S.P. felt "weird[ed] out," but followed Perry's directions. Perry donned disposable latex gloves, "like doctor gloves," he took from his nightstand. Perry told S.P. he was going to put his finger inside of her vagina and told her to lie down, then put his fingers inside her and moved them around. After he stopped, he told S.P. to put her clothes back on, and S.P. asked why he had put his finger inside her. Perry replied it was "to see if [you're] a virgin." Perry told S.P. he would get in trouble with the police and go to jail if she told Nakeya what happened, so S.P. said nothing to Nakeya that day. S.P. felt confused and embarrassed.

S.P. testified this "same routine" continued about once every week after that first instance, through her seventh grade year. Perry also sometimes began asking S.P. to take off her shirt, starting when she was 12, and would touch her breasts. When S.P. was 13, Perry began using two gloved fingers. Perry continued this "routine" until a family cruise in August 2017 at the start of S.P.'s eighth grade year, when she was 14. S.P. also testified that in March 2017, Perry asked her to perform oral sex on him. In August 2017 S.P. went on a weeklong family reunion cruise to the Bahamas with Perry, S.P.'s half-sister Shantai Lofton (Perry's eldest daughter, who was about a dozen years

4

older than Nakeya), and several other extended family members. Nakeya did not go. Perry and S.P. shared a room throughout the cruise. On the fourth day, while S.P. was resting in bed, Perry asked S.P. to take down her pants and underwear and kiss him. Perry kissed her and put two fingers inside her without using a glove. S.P. did not say anything to her family members on the cruise because she felt embarrassed and did not want them to know.

The weekend after the cruise, while S.P. was at his apartment, Perry told S.P. to lie down on the bed and said he was going to put his penis inside her. Perry then raped S.P. He used a condom and when he removed it he told S.P. he used it so she would not get pregnant, then flushed it down the toilet. S.P. did not tell Nakeya what happened because she was embarrassed and did not want Nakeya to be disappointed or angry with Perry. Perry raped S.P. again the following week, and again two weeks later.

The abuse continued intermittently during S.P.'s eighth grade year until the end of 2017. At trial, S.P. described it as occurring "many more times" and "once in a while" with no regular schedule. When she was in eighth grade, S.P. once pushed Perry off her and told him she did not want to "do it" anymore, and he "left [her] alone" and did not abuse her on that occasion. Another time, also in eighth grade, she kicked him when he approached her bed at night, and he walked away. The last time Perry raped S.P. was around December 2017; S.P. could not recall the last instance.

S.P. believed Perry's neighbors and building manager could see something was bothering her. Perry's next-door neighbor would ask her if he was treating her well, seeming concerned. S.P. testified Perry once yelled at her in front of building manager Estrella "Starr" Garcia, and Garcia looked shocked. S.P. testified she attended a residents' meeting where Garcia stated toilets were being clogged with toilet paper, food, wrappers, and condoms. Perry "paused" and looked at the ground during the meeting.

### 3. S.P. Discloses Perry's Abuse to Nakeya

Nakeya had a falling out with Perry and did not bring S.P. to his apartment between Thanksgiving and Christmas 2017. The dispute was about whether Nakeya was using Perry's disability benefits for S.P., and because Perry disliked Nakeya's boyfriend, Robin Dozier. Nakeya testified she and Perry resolved their differences by Christmas 2017 and planned for S.P. to stay with Perry for a week after Christmas.

On December 26, 2017 S.P. told Nakeya that Perry had been touching her. S.P. did not tell Nakeya everything at first because she was embarrassed and scared. Nakeya testified S.P. initially told her she did not want to stay at Perry's house after Christmas because he had been "checking" her "private area."

Immediately after S.P.'s initial conversation with Nakeya, Nakeya called Perry and told him S.P. said he had been "checking her," including on the cruise. Perry replied S.P. had asked him about sex, but he was otherwise quiet and did not give any other response or deny touching S.P. Nakeya told Perry she was going to tell "everybody," including her older sister, Lofton. When Nakeya could not reach Lofton, she called her mother,

6

Chandra Battee, who was previously married to Perry, and relayed S.P.'s allegations. Battee testified she and Perry remained friends after their divorce, and that she was close with S.P., who called her "Granny." Nakeya and Battee had a three-way call with Perry, 20 minutes after Nakeya's first call with Perry, during which Battee cursed at Perry, said "Oh, my God, you molested your daughter," and asked how he could do this. Perry said nothing until the end of the call, when he stated, "Well, you guys do what you got to do."

Later that day, Nakeya asked S.P. more about what had happened, and S.P. disclosed to Nakeya that Perry had raped her. Nakeya asked S.P. if she wanted to file a police report and press charges or "leave it alone," and S.P. said she wanted Perry to go to jail. S.P. felt it was the right thing to do, and did not feel pressured by Nakeya.

### 4. *Investigation and Interviews of S.P.*

The following day, Nakeya took S.P. to the Compton sheriff's station, where Deputy Adonay Molina interviewed S.P. separately from Nakeya. According to Deputy Molina, S.P. said her father had been sexually abusing her for about a year and recounted the details of the abuse.

On January 2, 2018 Sheriff's Detective Maricruz Perez met with S.P. and Nakeya. She spoke "briefly" with S.P. S.P. said Perry would check her "privacy area" when she would visit him, and that it also happened on a cruise around the beginning of September. The first occurrence was when she was 13 years old, on the last day of seventh grade. Perry was "always checking" S.P. because he thought she was having sex. Detective Perez set up appointments for S.P. to have a forensic interview and

7

physical examination.  Nakeya told the detective S.P. had learning disabilities and a tendency to lie about small things at school, but not at home.

Two days later, children's social worker (CSW) Tuyet Dang conducted a forensic interview of S.P. that Detective Perez monitored.  A video recording of the interview was played at trial during Dang's testimony.  S.P. recounted the details of Perry's abuse.  S.P. also told her Perry was "spreading rumors about [her] sister and her friend" and that, in November, Nakeya stopped allowing S.P. to visit Perry's apartment.

The following day, sexual assault nurse examiner Jennifer Rivera examined S.P.  Rivera testified she noticed no observable trauma or healed injury to S.P.'s genitals, but this was not inconsistent with sexual abuse and did not mean S.P. had not been penetrated.

5.      *Detective Perez Interrogates and Arrests Perry*

In April 2018 Detective Perez called Perry and asked if he would meet with her to discuss the case.  Perry agreed, and the next day they met at the Compton sheriff's station.  During the interrogation, Perry repeatedly denied abusing S.P., but made two incriminating statements:  he touched S.P. while adjusting a menstrual pad, and he kissed S.P. on the lips.  The entire interrogation was played to the jury during the detective's cross-examination.  The interrogation and *Miranda*-related rulings are covered in greater detail below.

C.    *Defense Evidence*

At trial, the defense theory was that Nakeya coached S.P. to falsely accuse Perry because of her dispute with him over money and her boyfriend. Perry did not testify but called several defense witnesses. Perry's next-door neighbor, Rochelle Collins, testified she met S.P. and saw her "quite a bit" when she stayed after school at Perry's apartment, but never spoke to S.P. alone or for long. She described S.P. as a "happy child" who never appeared uncomfortable or upset with Perry, who bragged about S.P. to the other residents. Collins said the walls were thin, and she never heard screaming, yelling, or a girl raising her voice in Perry's apartment.

Deborah Price lived several doors down and across the hall from Perry and testified she often saw Perry waiting for the school bus to drop S.P. off and had short conversations with S.P. S.P.'s demeanor was pleasant, she did not appear upset when she came to see Perry, and Price never observed any harsh behavior toward S.P. from Perry or heard any screaming or noises from Perry's apartment. Price noticed no change in S.P.'s demeanor over time, and never got any notification or heard discussions from the apartment manager about condoms clogging building toilets.

Garcia was the property manager at Perry's apartment complex. When S.P. visited Perry, she sometimes stopped by Garcia's office to say hello and chat briefly with Garcia alone. Garcia testified S.P. appeared in good spirits and never seemed upset or uncomfortable with Perry. Garcia received no noise complaints about Perry, and the building had no plumbing issues involving condoms.

9

Deidra Murphy, Perry's niece, testified she had known Perry for 53 years. In 2017 Murphy and several family members, including Perry and S.P., went on a family reunion cruise. S.P. seemed happy to be there, and Murphy did not notice any tension or anything strange or inappropriate between Perry and S.P. Murphy and her husband, Emmanual Huff, testified they never had any concern about Perry's interaction with their three daughters. When they got off the flight home, S.P. accused Huff of misplacing her iPad, but a flight attendant ultimately returned it and said it was left on a backseat.

Lofton, who is the older half-sister of Nakeya and S.P., testified she did not have a "personal relationship like a sister" with S.P. or a "sister bond" with Nakeya. S.P. and Lofton had never talked privately or spent any time one-on-one. Lofton had a strained relationship with Nakeya because Lofton believed Nakeya was jealous of her closer relationship with Perry. When Nakeya called Lofton and told her about S.P.'s allegations, Nakeya said she did not know whether to believe S.P. because S.P. lied a lot. Lofton told Nakeya to take S.P. to the doctor the next day and not to call Perry because he was on sleep medication and would not know what he was saying. Perry never inappropriately touched or checked Lofton.

Lofton testified S.P. was quiet on the family cruise but did not appear upset or scared. Lofton said S.P. lied to her on the cruise, saying she had bought a certain towel Lofton knew S.P. had not actually purchased. Lofton opined S.P. lied, S.P. was not truthful, and S.P. believed anything anyone told her. Nakeya told Lofton S.P. lied a lot. Lofton talked to Perry about S.P.'s allegations, which he denied. Lofton testified Perry never told

10

her he accidentally touched S.P. while helping her put on a menstrual pad.

On recall, Detective Perez testified that when she interviewed Lofton in April 2018, Lofton said Perry told her he had helped S.P. with a menstrual pad. Detective Perez also testified Battee told her that when Battee and Nakeya called Perry to confront him about abusing S.P., Perry sounded like he was asleep.

### D. *Jury Verdict and Sentencing*

The jury convicted Perry of sexual penetration by a foreign object of a minor 14 years old or older (§ 289, subd. (a)(1)(C)) and forcible rape of a minor 14 years old or older (§ 261, subd. (a)(2)). The jury was unable to reach a verdict on the continual sexual abuse count, and the court declared a mistrial on that count.

In September 2021 the court denied probation and sentenced Perry to the upper term of 11 years on the forcible rape count as the base count, and a full consecutive upper term of 10 years on the sexual penetration by a foreign object count, for an aggregate prison term of 21 years. The court found six aggravating and no mitigating circumstances, stating it "selected the high term based on the aggravating factors substantially outweighing or the nonexistence of mitigating factors."

Perry timely appealed.

## DISCUSSION

On appeal, Perry raises several arguments: (1) his police interrogation should have been excluded under *Miranda*; (2) S.P.'s statements to others about the abuse should have been

11

excluded under the hearsay rule; (3) the prosecution's rebuttal closing argument contained prosecutorial error; and (4) he is entitled to resentencing under amendments to section 1170, subdivision (b).  We consider each in turn.

A.    *Perry's Interrogation Did Not Violate* Miranda *Because He Was Not in Custody*

Perry contends the trial court erred by admitting the recording of his entire police interrogation because it became custodial under *Miranda* at the "midway" point.  The trial court did not err.[3]

1.    *Governing Law and Standard of Review*

"A defendant who is in custody . . . must be given *Miranda* warnings before police officers may interrogate him," and generally statements obtained in violation of *Miranda* are inadmissible.  (See *People v. Haley* (2004) 34 Cal.4th 283, 300.)  Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra,* 384 U.S. at p. 444; see *People v. Thomas* (2011) 51 Cal.4th 449, 476.)  Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (*People v.*

---

[3]    The People concede Perry's interview was "reasonably likely to elicit an incriminating response" and thus an "'interrogation'" within the meaning of *Miranda.*  (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301; *People v. Elizalde* (2015) 61 Cal.4th 523, 531.)

*Mickey* (1991) 54 Cal.3d 612, 648, quoting *Rhode Island v. Innis, supra,* 446 U.S. at p. 301.) "'Absent "custodial interrogation," *Miranda* simply does not come into play.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)

We use an objective standard to determine whether a person was in custody for *Miranda* purposes. (See *People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) Whether a person is in custody under *Miranda* presents a mixed question of law and fact. (*Ibid.*; see also *People v. Ochoa, supra,* 19 Cal.4th at p. 401). "[T]he pertinent inquiry is whether there was ""a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.""" (*Leonard,* at p. 1400.) If no formal arrest has taken place, the relevant question is "whether a reasonable person in defendant's position would have felt he or she was in custody." (*People v. Stansbury* (1995) 9 Cal.4th 824, 830 (*Stansbury*).)

"In reviewing the trial court's denial of a suppression motion on *Miranda* . . . ""we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained."""" (*People v. Duff* (2014) 58 Cal.4th 527, 551, quoting *People v. Enraca* (2012) 53 Cal.4th 735, 753.)

2.     *The Trial Court's* Miranda *Ruling*

During pretrial proceedings, the trial court denied Perry's motion to suppress after hearing testimony from Detective Perez. She testified she called Perry and asked if he would come in for an interview. Perry agreed and met her at the sheriff's station

the next day. Detective Perez met him in the station lobby and walked Perry by herself to a small interview room on the second floor containing a table and two chairs. Perry was not handcuffed and went voluntarily. Detective Perez did not make physical contact with Perry, search him, or draw a weapon.

Detective Perez told Perry she was investigating a case, he was not under arrest, and he was free to leave at any time. Perry sat closer to the door than she did. Detective Perez informed him the door was not locked and he could leave the same way he had come up. Perry never asked to leave the room, never physically tried to leave the room, and Detective Perez never physically restrained Perry from leaving. Perry generally appeared to be comfortable and in a good mood. Perry consented to recording. Detective Perez spoke to Perry alone for approximately an hour and a half. During the interrogation, Perry answered three cell phone calls, and Detective Perez did not prevent him from taking the calls.

Over the course of the interrogation, Perry became upset with Detective Perez's questions. He then said the following: "But we—we're going to stay on the same conversation until I get pissed off. You know, walk out of here. Look. Why am I going to do that? We're not going to solve anything by arguing. You know?" Perry then asked if he needed to get a lawyer. Detective Perez then said, "I'm done," arrested Perry, and read him his *Miranda* rights. Perry then confirmed incriminating statements he made during the interrogation (including that he touched S.P. while adjusting a menstrual pad and that he kissed her on the lips). Detective Perez testified she spoke to Perry "just like [she was] speaking" to the court during the hearing.

14

The trial court ruled Perry was not in custody under *Miranda*, noting that Detective Perez's demeanor was inconsistent with an "accusatory style interrogation."

3.      *Under the Totality of the Circumstances Perry Was Not in Custody for Purposes of* Miranda

To determine if Perry was in custody for *Miranda* purposes*,* we consider "all the circumstances regarding the interrogation," to determine if they constituted a ""'restraint on freedom of movement" of the degree associated with a formal arrest.'" (*Stansbury, supra,* 9 Cal.4th at p. 830.)

Relevant factors include:  "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation.  [Citations.]." (*People v. Aguilera* (1996)

15

51 Cal.App.4th 1151, 1162 (*Aguilera*); accord, *In re I.F.* (2018) 20 Cal.App.5th 735, 759; *People v. Saldana* (2018) 19 Cal.App.5th 432, 459 (*Saldana*).)  "No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether . . . they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, at p. 1162.)

On appeal, Perry concedes the first half of the interrogation was not custodial.  We agree.  Perry voluntarily agreed to the interview and came to the station.  He was not searched, handcuffed, or otherwise restrained or restricted in his freedom of movement.  He sat closer to the door than Detective Perez.  He was interrogated by a single officer.  Perry was told at the outset he was not under arrest, could leave at any time, the door was unlocked, and he could exit the station by taking the same route that had brought him there.  Under these circumstances there were no indicia of coercion or restraint, and "telling [defendant] he was not under arrest and was free to leave indicates the beginning of the interrogation was not custodial." (*Saldana, supra,* 19 Cal.App.5th at p. 457.)[4]

We reject Perry's contention the interrogation turned custodial at the midway point, having independently reviewed the transcript and recording.  According to Perry, at that point "[Detective] Perez informed [Perry] that [S.P.] had told her [Perry] had touched her inappropriately and she believed [S.P.]." Specifically, Perry maintains that because the detective "[1.] interrogated [him] for an hour and a half, [2.] behind the closed

---

[4]    Perry concedes at least one incriminating statement early in the interview (that he touched S.P. while adjusting her menstrual pad) was not the product of custodial interrogation.

16

door of an interview room at the sheriff's station, [3.] dominated the interrogation, [4.] informed [him] she believed he was guilty and she had the evidence to prove it, [5.] interrogated [him] in an accusatory, confrontational, and aggressive manner, [6.] used interrogation techniques to try to elicit incriminatory admissions, and [7.] arrested [him] at the end of the interrogation, a reasonable person would have believed he was not free to leave."

First, it is clear that despite the length of the interrogation, Perry felt free to leave when he stated toward the end that he was ready to, "You know, walk out of here." (See *Howes v. Fields* (2012) 565 U.S. 499, 509 [a person is in custody if he or she feels that he or she cannot end the interrogation and leave].) Earlier in the interrogation he answered his cell phone two times, and Perry answered a third call after the midway point of the interrogation, telling the caller he would return the call after he was done. Further, as Perry's authorities confirm, the length of the interrogation itself is not dispositive. (See *People v. Moore* (2011) 51 Cal.4th 386, 402 (*Moore*) [interview of "one hour 45 minutes" interview at station house noncustodial]; *Green v. Superior Court* (1985) 40 Cal.3d 126, 131-135 [two-hour interview at station noncustodial]; *Saldana, supra,* 19 Cal.App.5th at p. 463 [duration may be a "tipping point" in close case, but "the more significant factor is the nature of the questioning, the character and quality of the interaction" between officer and suspect].)

Next, it is true Perry was arrested at the end of the interrogation, but that arrest did not necessarily make the challenged part of the interrogation custodial. (E.g., *Moore, supra,* 51 Cal.4th at p. 403 [no *Miranda* violation under the

17

totality of the circumstances, despite "indications of police skepticism" and formal arrest of suspect at end of interview].)

As to the remaining factors going to the location and the nature of the interrogation, that Perry's interrogation took place at a sheriff's station and had some accusatory or strategic interrogation aspects to it does not inevitably render it custodial. (See *Oregon v. Mathiason* (1977) 429 U.S. 492 (*Mathiason*); *Stansbury, supra,* 9 Cal.4th at p. 833.) As summarized by our Supreme Court, "in [*Mathiason*] . . . the high court found that the defendant was not in custody, though he was questioned in the allegedly coercive environment of the police station. In that case, the defendant acceded to a police officer's request to be interviewed at the police station. The officer told the defendant he was not under arrest, but the interview was accusatory to the extent that the officer told the defendant he was a suspect in a burglary, and falsely told him that his fingerprints had been found on the scene. The court nevertheless found that custody had not been established." (*Stansbury,* at p. 833, quoting *Mathiason,* at p. 495.)

The court in *Stansbury* continued: "'Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes . . . the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. *Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the*

18

*questioned person is one whom the police suspect.*'" (*Stansbury, supra,* 9 Cal.4th at p. 833, quoting *Mathiason, supra*, 429 U.S. at p. 495, italics added.)

"Indeed, '[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the . . . issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 345, quoting *Stansbury v. California* (1994) 511 U.S. 318, 325.) Even where "police indicate to the defendant their resolute belief he committed the crime, the custody inquiry becomes whether a reasonable person in the defendant's situation . . . would think he was free to break off the interview and leave." (*Saldana, supra,* 19 Cal.App.5th at pp. 457-458 [although interrogation was not initially custodial, subsequent "unrelenting number of accusatory questions" made defendant feel he could not leave until he confessed and rendered subsequent interrogation custodial].)

We are persuaded Perry was not in custody even after the midpoint of his interrogation because his actions confirmed he felt free to leave until the moment he was arrested. The overall tone and tenor of the interrogation was generally conversational rather than one where the detective dominated. Although the detective falsely stated she had forensic and DNA evidence indicating Perry's guilt, her use of this interrogation technique was not unrelenting. Detective Perez was not confrontational or aggressive, let alone threatening or intimidating. She expressed skepticism about Perry's explanations, but asked open-ended questions, and generally stated "something happened" for which

19

she wanted an explanation. To be sure, Detective Perez accused Perry of dishonesty, but she was not unduly accusatory, and did not raise her voice or threaten Perry. Perry also agreed with Detective Perez that she was not arguing with him and that she had not yelled at him.[5] Further, as noted above, Perry answered a cell phone call after the midway point and told the caller he would call back and, near the end of the interrogation, told Detective Perez he would "walk out of here" if he got "pissed off." These are not circumstances where a reasonable person would believe he was in custody.

Perry's interrogation was like that in *Moore, supra,* 51 Cal.4th 386. There, "[t]he interview was fairly long—one hour 45 minutes—but not, as a whole, particularly intense or confrontational . . . . For a substantial period, while defendant filled in his previous statements with details, the questioning did not convey any suspicion of defendant or skepticism about his statements. [¶] After a while, to be sure, the detectives interjected some more accusatory and skeptical questions." (*Id.* at p. 402.) Our Supreme Court observed such "police expressions of suspicion . . . are not necessarily sufficient to convert voluntary presence at an interview into custody" and "a reasonable person in defendant's circumstances would have believed, despite indications of police skepticism, that he was not under arrest and

---

[5] The trial court gave this factor significant weight, on the assumption Detective Perez had a similar demeanor at the *Miranda* hearing as she did in the interview. We note that, in other circumstances, a "professional demeanor" and "pleasant and conversational tone of voice" is not inconsistent with custody; rather, "a professional and calm demeanor is a police technique to keep a suspect there, answering questions." (*People v. Torres, supra,* 25 Cal.App.5th at p. 179.)

was free to terminate the interview and leave if he chose to do so." (*Id.* at pp. 402-403.)

Perry's authorities are inapposite. *Aguilera, supra,* 51 Cal.App.4th 1151 dealt with two officers engaging in a "tag team" interrogation lasting two hours that "was intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating" (*id.* at p. 1165). *Saldana, supra,* 19 Cal.App.5th 432 involved questioning that was "persistent, confrontational, and accusatory." The detective there "did much more than simply confront Saldana with adverse evidence. He confronted Saldana with unqualified assertions of his guilt, despite Saldana's repeated denials." (*Id.* at p. 459.) By contrast, Detective Perez's questioning, while pointed and disbelieving of Perry's version of the events, was not impermissibly accusatory and confrontational. (See *id.* at p. 460 ["Over and over again, Detective Gonzales conveyed the message that Saldana had no meaningful choice but to admit to some version of the crime because continued denials—in light of the extensive and irrefutable evidence against him—was simply futile. Insisting on the 'truth' until Saldana told him what he sought, the objective message conveyed was that Saldana would be interrogated until he admitted touching the girls."].) Nor are the circumstances here like *Torres, supra,* 25 Cal.App.5th 162, where the detectives "essentially [told] Torres they would not leave, and Torres could not return home, until Torres stopped lying and confessed to what the detectives could prove scientifically with the DNA test running in the trunk." (*Id.* at p. 179.)[6]

---

[6] Perry's cases involving interrogation of minors do not help him. (*In re I.F., supra,* 20 Cal.App.5th at p. 772 [12-year-old defendant]; *In re Matthew W.* (2021) 66 Cal.App.5th 392, 407 [17-

21

In sum, we conclude that based on the totality of the circumstances Perry was not in custody for *Miranda* purposes.[7]

4.    *The Trial Court Did Not Err by Admitting the Entire Interrogation*

Perry's counsel twice asked the court to admit the entire interrogation rather than allow the prosecution to play excerpts. After reviewing the interrogation, the court agreed.  On appeal, Perry now challenges admission of the entire interrogation. There was no error because the entire interrogation was noncustodial, and Perry advances no other argument why it should have been excluded.  (See *People v. Waldon* (2023) 14 Cal.5th 288, 304 ["""The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest.  If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . .  [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake."""]; see also *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538 [appellant's failure to brief issue on appeal forfeits it].)

_____

year-old defendant].)  Perry does not argue he was vulnerable due to his age.

[7]    Because we conclude the interview was noncustodial and no *Miranda* admonition was required, we need not address Perry's argument Detective Perez employed a deliberate "two-step" interrogation process violating *Missouri v. Seibert* (2004) 542 U.S. 600, 622 (police may not deliberately question suspect to elicit confession, give *Miranda* warnings and then re-question the suspect).

B.      *The Trial Court Did Not Abuse Its Discretion by Admitting S.P.'s Pretrial Statements*

At trial, the court admitted several of S.P.'s pretrial statements alleging Perry had abused her.  Perry challenges admission of three sets of statements S.P. made to Nakeya, Detective Perez, and CSW Dang.  According to Perry, the trial court prejudicially erred by admitting these statements as prior consistent statements.  We review for abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 590; accord, *People v. Waidla* (2000) 22 Cal.4th 690, 725 ["an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question"].)

1.      *The Hearsay Rule and Relevant Exceptions*

"Hearsay is an out-of-court statement offered to prove the truth of its content."  (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see Evid. Code, § 1200, subd. (a).)  Any out-of-court statement made by a testifying witness, offered to prove the truth of the matter asserted, is inadmissible hearsay unless it falls within a recognized exception.  (Evid. Code, § 1200, subds. (a) & (b); *People v. Alvarez* (1996) 14 Cal.4th 155, 185.)  Evidence Code sections 791 and 1236 set forth an exception for a testifying witness's prior consistent statements.

Evidence Code section 1236 provides:  "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

Evidence Code section 791 in turn provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

An out-of-court statement may be hearsay or nonhearsay depending on the purpose for which it is offered. Under Evidence Code section 1250, relevant evidence of a declarant's existing state of mind, emotion, or physical sensation "is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a); *People v. Riccardi* (2012) 54 Cal.4th 758, 823 (*Riccardi*), disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) A declarant's descriptions or assessments of the victim's actions affecting her state of mind or conduct are admissible nonhearsay, "to the extent they were admitted to prove circumstantially [the victim's] state of mind or conduct, and not to prove the truth of matters asserted regarding defendant's conduct." (*Riccardi*, at p. 823; see Evid. Code, § 1250, subd. (b) ["This section does not make admissible evidence of a

statement of memory or belief to prove the fact remembered or believed"].)

Perry contends the challenged statements were inadmissible hearsay because they fail the temporality requirement of Evidence Code section 791, subdivision (b). The People argue the statements were admissible under section 791, subdivision (a), and under the state of mind exception. We address each witness's statements in turn.

2.     *S.P.'s Statements to Nakeya*
   a.     *Nakeya's initial testimony recounting S.P.'s statements was properly admitted to show S.P.'s state of mind*

Nakeya was the first witness to testify. During her testimony, the trial court overruled hearsay objections regarding: S.P.'s statements to Nakeya relating to S.P.'s preliminary hearing testimony; whether S.P. voluntarily wanted to report the allegations and testify in court; and whether S.P. understood the seriousness of the allegations. Nakeya testified S.P. "always told me she wants to see [Perry] go to jail," and that S.P. always answered "yes" she wants to continue even though "[s]he dreads coming to court" and getting on the stand. The court instructed the jury each time that Nakeya's answers to those questions were offered to prove S.P.'s state of mind, not for the truth of the matter.

Contrary to Perry's argument, these statements were not admitted as prior consistent statements. Although the trial court admitted S.P.'s statements to Nakeya under the state of mind exception, Perry made no argument in his opening brief that these statements were improperly admitted under that exception,

25

and offered no response in his reply brief to the People's argument these statements were properly admitted under the state of mind exception. Perry has thus forfeited any objection. (See *Golden Door Properties, LLC v. Superior Court* (2020) 53 Cal.App.5th 733, 786 [issues not addressed as error in a party's brief with legal analysis and citation to authority are forfeited].)

In any event, the statements were admissible because they were relevant to S.P.'s credibility and to her state of mind on a key theory at issue in the action: whether S.P. testified voluntarily, or whether S.P. was pushed to do so or was coached by Nakeya. In Perry's opening statement, his counsel set forth the defense's theory that S.P. made the accusations against Perry because of a family conflict between Nakeya and Perry, and that Nakeya pushed S.P. to testify. Nakeya's testimony described S.P.'s statements to clarify the conversations the sisters had before S.P. decided to report the conduct and testify in court. S.P.'s statements to Nakeya tended to show S.P. voluntarily chose to report the abuse, wanted to see Perry go to jail for his actions, and appreciated the seriousness of her testimony. The trial court was within its discretion in admitting these statements as they went to S.P.'s credibility and state of mind with regard to whether she was voluntarily testifying against Perry, particularly given the court's limiting instructions to the jury. (See Evid. Code, § 1250; *Riccardi, supra,* 54 Cal.4th at pp. 822-823 [out-of-court statement may be admissible nonhearsay for purpose of providing circumstantial evidence of the declarant's state of mind].)

b.  *Nakeya's recalled testimony regarding S.P.'s descriptions of abuse were properly admitted as prior consistent statements*

S.P. testified after Nakeya, but was impeached with several prior inconsistent statements.  These included her testimony from the preliminary hearing and statements to the police and to CSW Dang regarding:  her age and grade when the abuse began; the frequency, timing, and number of instances of the abuse; and whether she consistently reported Perry making her put her mouth on his penis.  Perry's counsel sought to show her story was inconsistent and S.P. had been coached by Nakeya.

Nakeya was recalled to the stand and testified about her first conversation with S.P. in December 2017 regarding Perry's abuse, over defense counsel's standing hearsay objection.  Nakeya relayed the following additional hearsay statements from S.P.: (1) Perry had been "checking her"; (2) Perry put his fingers in her private parts; (3) Perry checked S.P. on the cruise; (4) Perry had sexual intercourse with S.P.; and (5) S.P. was certain that the sexual abuse happened.

Perry concedes these prior "statements were consistent with [S.P.]'s trial testimony," but contends they did not satisfy Evidence Code section 791, subdivision (b)'s temporality requirement (because they were made after the family dispute that purportedly motivated S.P. to fabricate the allegations) and the admitted statements "did not rehabilitate any of [S.P.]'s inconsistent statements."

The trial court properly admitted these statements under Evidence Code section 791, subdivision (a), which only requires that "evidence of a prior *inconsistent* statement [made by the witness] has already been introduced to impeach that witness,

27

and the consistent statement was made before the inconsistent one." (*People v. Cook* (2007) 40 Cal.4th 1334, 1357.) S.P.'s statements preceded the inconsistent statements used to impeach her, and were consistent with her trial testimony. Section 791, subdivision (a), does not require more, and Perry cites no authority the statements also had to be separately admissible under subdivision (b). (*People v. Manson* (1976) 61 Cal.App.3d 102, 144 ["Whether or not subdivision (b) of Evidence Code section 791 is applicable is of no consequence to the application of subdivision (a) of that section. Even if it is assumed the [prior consistent statement] postdated the inception of any bias or motive to fabricate on the part of [the witness], that fact would only bear on its introduction within the circumstances described in subdivision (b) of section 791. It certainly would not preclude application of subdivision (a) of section 791 and the introduction of the [prior consistent statement] predating the [prior inconsistent statement]. The statement was properly admitted."].)

Perry asserts these statements were inadmissible under Evidence Code section 791, subdivision (a), because they did not specifically rehabilitate certain details of S.P.'s prior inconsistent statements to Detective Perez and CSW Dang (including that Perry's abuse was less frequent than she testified at trial and that her statements to Detective Perez and CSW Dang omitted that Perry forced her to put his penis in her mouth, as she testified at trial). Perry further argues these statements "simply bolstered" S.P.'s testimony, citing *People v. Gentry* (1969) 270 Cal.App.3d 462, 473 ("it cannot help the trier of fact in deciding between [two witnesses] merely to show that one of the witnesses has asserted the same thing previously").

To be admissible, a prior consistent statement offered to support the witness's credibility need only be consistent with the witness's trial testimony, and there is no requirement that it directly address each specific statement used to impeach the witness.  (See Evid. Code, § 791, subd. (a); see also *People v. Brents* (2012) 53 Cal.4th 599, 616 [where defense counsel suggests a witness's entire testimony is unreliable, "not just that [she] had fabricated some specific point," this "broad charge of fabrication" warrants the admission of a prior consistent statement]; cf. *People v. Calhoun* (2019) 38 Cal.App.5th 275, 317-318 [charge of fabrication under section 791, subdivision (b), allowed the admission of prior statements that "were for the most part consistent" with the witness's trial testimony].)  Further, S.P.'s statements were not admitted for impermissible bolstering purposes—that is, to show she said the same thing previously—but, instead, to rehabilitate her testimony after defense counsel impeached her, which is wholly permissible under *Gentry*.

For the first time on reply, Perry argues the trial court erred in admitting the hearsay statements because they did not concern "the same fact or facts" as the prior inconsistent statements with which S.P. was impeached, citing *People v. Ervine* (2009) 47 Cal.4th 745, 780 (*Ervine*), and *People v. Breaux* (1991) 1 Cal.4th 281, 302 (*Breaux*).[8]  According to Perry, these cases stand for the proposition that "a prior consistent statement is admissible under Evidence Code section 791, subdivision (a), only if [it] concerns the same fact or facts as the prior

---

[8]     Although we have no obligation to discuss arguments raised for the first time on reply (*Gee v. Greyhound Lines, Inc.* (2016) 6 Cal.App.5th 477, 489, fns. 9 & 10), we exercise our discretion to do so here.

29

inconsistent statement with which the witness has been impeached." Neither case announces any rule that prior consistent statements admitted under Evidence Code section 791, subdivision (a), must directly contradict the prior inconsistent statements (nor could they because that would be contrary to the text of subdivision (a), which imposes no such requirement). At most, these cases support the unremarkable proposition that courts retain their discretion to exclude prior hearsay statements that are either consistent with the prior inconsistent statements (as in *Ervine*) or are wholly unrelated to the prior inconsistent statements (as in *Breaux*).

### 3. *S.P.'s Statements to Detective Perez*

At trial, Perry objected to Detective Perez's testimony regarding S.P.'s statements to her at their January 2018 interview. The trial court overruled Perry's hearsay objection regarding what S.P. said to Detective Perez about her family and allowed a standing objection that S.P.'s statements describing her abuse were "not even consistent." On appeal, Perry objects to Detective Perez's testimony relating S.P.'s statements regarding the abuse.[9]

---

[9] Specifically, Perry objects to the following testimony that Perry: was "checking" her with his index finger while wearing gloves; asked her to raise her legs; told her it was for her own good; told her he was checking her because he thought she was having sex; put his fingers inside S.P. and wiggled them around; was told by S.P. that it hurt and to remove his finger; removed his gloves in the bathroom; and that he sexually assaulted her on the cruise.

The trial court explained it overruled Perry's hearsay objection under Evidence Code sections 1236 and 791 because "there was an implication that the testimony [S.P.] gave here [at trial] or in the preliminary hearing was fabricated or influenced and this [is] a prior consistent statement for her testimony here." The trial court did not cite a specific subdivision of Evidence Code section 791, but its "fabricated or influenced" language suggests it admitted under subdivision (b).

Perry argues the trial court misapplied Evidence Code section 791, subdivision (b), because S.P.'s statements to Detective Perez in January 2018 came after Thanksgiving 2017 (when S.P. allegedly had a motive to fabricate her statements), and because they "did not rehabilitate any of [S.P.]'s inconsistent statements." To the extent the trial court admitted this testimony under section 791, subdivision (b), it misapplied that rule. To refute a charge of fabrication or bias under Evidence Code section 791, subdivision (b), "a prior consistent statement is admissible as long as the statement is made *before* the existence of any one of the motives that the opposing party expressly or impliedly suggests may have influenced the witness's testimony." (*People v. Noguera* (1992) 4 Cal.4th 599, 629, italics added.) But "if the consistent statement was made after the time the improper motive is alleged to have arisen, the logical thrust of the evidence is lost and the statement is inadmissible." (Cal. Law Revision Com. Report, West's Ann. Evid. Code (2022 ed.) foll. § 791, italics added.)

We conclude, however, there was no reversible error. Just as with S.P.'s statements to Nakeya, S.P.'s statements to Detective Perez were admissible under Evidence Code section 791, subdivision (a), because they were consistent with

31

her trial testimony and were introduced to rehabilitate her after she was impeached. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 369, fn. 9 ["'We will affirm the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case, even if for reasons different than those expressly stated by the trial court.'"], quoting *People v. Fruits* (2016) 247 Cal.App.4th 188, 205.) And, as we explained above, there is no separate requirement under subdivision (a) that prior statements consistent with her trial testimony "rehabilitate" her inconsistent statements.[10]

4.      *S.P.'s Statements to CSW Dang (Forensic Interview)*

During the direct examination of CSW Dang, over Perry's hearsay objection, the prosecution played the entire video recording of Dang's forensic interview of S.P. in January 2018. Perry argues S.P.'s hearsay statements in the interview were inadmissible under Evidence Code section 791, subdivision (b), and that these statements "did not rehabilitate her inconsistent statements." We conclude S.P.'s statements to CSW Dang were admissible under section 791, subdivision (a), for the same reasons set forth above, i.e., they were prior consistent statements offered to rehabilitate S.P.'s trial testimony after the defense impeached her with prior inconsistent statements.

---

[10]      Perry concedes he raised no hearsay objection to Detective Perez recounting S.P.'s statements during the forensic interview with CSW Dang. Perry forfeited any objection. (Evid. Code, § 353, subd. (a); *People v. Stevens* (2015) 62 Cal.4th 325, 333 [failure to object to hearsay testimony at trial forfeits appellate claim improperly admitted].)

Perry also maintains that even if parts of the forensic interview were admissible, it was error to admit the entire interview, citing *Riccardi, supra,* 54 Cal.4th at p. 803. According to Perry, many details in the forensic interview were inconsistent with S.P.'s trial testimony and "did more than rehabilitate" S.P.[11] (Evid. Code, § 791; *Riccardi,* at p. 803 [trial court erred in admitting portions of audio-recorded police interview of witness with "little relation" to the relevant inconsistencies, went beyond the scope of her trial testimony, and "did more than rehabilitate" the challenged testimony"].) Here, however, S.P.'s statements from the forensic interview were directly related to her trial testimony recounting her allegations and descriptions of Perry's abuse. The trial court was well within its broad discretion to permit the entire interview to be played.

5. *The Challenged Statements Were All Admissible, and There Was No Federal Due Process Violation*

Because we find all the challenged hearsay statements were admissible, there was no federal due process violation. (*People v. Kraft* (2000) 23 Cal.4th 978, 1035-1036 ["Application of the ordinary rules of evidence generally does not impermissibly infringe on a . . . defendant's constitutional rights. [Citation.] Defendant fails to persuade us this case constitutes an exception to that general rule."].)

---

[11] Specifically, Perry claims the following hearsay statements from the forensic interview "did more than rehabilitate [S.P.]" and "should not have been admitted": (1) S.P.'s statements that when Perry inserted his finger, he was laughing and refused to take it out when she said it hurt; (2) S.P.'s statement that when she tried to move Perry's hands away from her chest, he threatened to hit her with a belt.

C.    *Any Prosecutorial Error in the Closing Argument Was*
      *Harmless*

Perry contends the prosecutor committed prejudicial error under state and federal law during closing arguments by suggesting the defense strategically shared only certain portions of Nakeya's recorded calls with Dozier rather than their entirety. The prosecutor had previously successfully limited Perry's use of the two jail calls.  Perry argues the trial court erroneously overruled his objection.  We conclude any error was harmless.

1.    *Governing Law and Standard of Review*

The prosecution's closing argument to the jury is subject to review for prosecutorial error under state law and federal law. Such error occurs "as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.]  Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.'" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854 (*Daveggio*), quoting *People v. Lightsey* (2012) 54 Cal.4th 668, 718; accord, *People v. Seumanu* (2015) 61 Cal.4th 1293, 1331-1332 ["'"A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury."'"].)  Bad faith by

34

the prosecutor is not required. (*People v. Hill* (1998) 17 Cal.4th 800, 821; accord, *People v. Lloyd* (2015) 236 Cal.App.4th 49, 61.) In this regard, "'[t]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error.'" (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667; see *People v. Sandoval* (2015) 62 Cal.4th 394, 438.) "[T]he burden of proof is on the defendant to show the existence of misconduct." (*People v. Van Houten* (1980) 113 Cal.App.3d 280, 292.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Centeno*, *supra*, 60 Cal.4th at p. 667.)

We review a trial court's ruling regarding prosecutorial error for abuse of discretion. (See *People v. Alvarez, supra,* 14 Cal.4th at p. 213.) ""To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument."" (*People v. Charles* (2015) 61 Cal.4th 308, 327.)

"In evaluating whether prosecutorial error is prejudicial, the standard for prejudice depends on whether the error violates the federal Constitution or the California Constitution." (*People v. Collins* (2021) 65 Cal.App.5th 333, 342.) "'In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict.' [Citation.] Under federal law, relief is not available if 'the challenged conduct was . . . harmless beyond a reasonable doubt.'" (*Daveggio, supra,* 4 Cal.5th at p. 854, quoting *People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 333-334.)

2.      *Relevant Background: The Court Admitted Only Limited Portions of Nayeka and Dozier's Conversations at Trial Due to the Prosecution's Objections*

Perry's primary defense theory at trial was that Nakeya coached S.P. to fabricate the accusations against him because of Nakeya's dispute with Perry regarding his disapproval of Nayeka's live-in boyfriend, Dozier, and the use of money. To impeach Nakeya at trial, the defense played six excerpts from two telephone calls between Nakeya and Dozier, which were recorded when Dozier was in jail for unrelated charges. The parties and court previously had several exchanges regarding the admissibility of the calls, and defense counsel provided the court with transcripts of the calls.

The court initially admitted excerpts germane to "two areas": (1) whether Dozier and Nakeya had a public fight that impeached Nakeya's testimony denying or not remembering the fight; and (2) whether Nakeya had coached S.P. during the lunch

36

break at the preliminary hearing.[12] The court subsequently admitted additional excerpts to show: (1) Nakeya spoke to S.P. during the lunch break at the preliminary hearing; (2) Nakeya's tone and demeanor; (3) Nakeya told S.P's foster parents that S.P. lied a lot; and (4) Nakeya and Dozier were more than just friends.

At trial, Nakeya and S.P. both denied that Nakeya coached S.P. at the preliminary hearing. Defense counsel used Nakeya's calls to Dozier to impeach Nakeya regarding whether she spoke to S.P. at the preliminary hearing and whether she had a public verbal fight with Dozier. Nakeya testified at trial she lied to Dozier on the recorded call and did not in fact speak to S.P. about her testimony until that evening after S.P. finished testifying.

On redirect examination, Nakeya testified she remembered when she had that conversation with Dozier, but had not heard the whole recording and did not remember the context. The prosecutor showed Nakeya what she described as the "actual transcript, this 54-page transcript," and asked Nakeya whether any of "these little snippets of conversations that you had with Mr. Dozier" were different from what Nakeya testified to at trial, to which Nakeya responded, "No, it isn't." At sidebar, defense counsel argued the prosecutor's questioning implied defense

---

[12] At the preliminary hearing, S.P. answered "no" to questions from defense counsel regarding whether she went to Perry's house after school or was ever alone with Perry. Nakeya's friend (or cousin) Raquel was in the courtroom, which Nakeya was excluded from as a witness. On one of the recorded calls, Nakeya later told Dozier that Raquel recounted S.P.'s testimony to her and that Nakeya pulled S.P. aside at lunch, asked why she was lying and whether she wanted Perry "to go free?" After the lunch break, S.P. testified she visited Perry's house, where he would touch her.

37

counsel was "cherry-picking information" by introducing "limited snippets" of Nakeya's conversation with Dozier. Perry's counsel moved to have the entire conversation admitted "to give the full context." He argued it was prosecutorial misconduct to say evidence was "non-existen[t]," and the jury was getting the misimpression the defense limited the calls and "there's more out there that would somehow explain this." The prosecutor responded she had played only portions that counsel had highlighted and it was not misconduct to have Nakeya explain her statements.

The trial court found "absolutely no prosecutor misconduct or any conduct by [the prosecutor] that was the context that she was able to or provide [Nakeya] the transcript so [Nakeya] can review more of her conversation to remind her and give context to that what she said." The court denied defense counsel's request for a jury instruction that the court had restricted what had been presented, and the court instead said it would instruct the jury that "these are part of a conversation" and they were not to speculate further.

On further cross-examination, defense counsel asked Nakeya if it would be helpful for her to hear the whole conversation "in order to know the context." Nakeya responded "No" and that she had read the transcript.

The trial court instructed the jury: "You have heard parts of a conversation, the parts that were played for you. You are not to speculate as to what the contents of the other parts that you did not hear are. You're not to speculate as to why you did not hear the other parts of the conversation. All you have to understand is that these conversations were, in fact, legally

recorded and provided to both counsel in the regular course of trial preparation."

### 3. *Any Error in the Prosecutor's Closing Argument Was State Law Error and Harmless*

On appeal, Perry does not challenge the trial court's rulings above, but instead argues the prosecutor's rebuttal closing argument constituted prosecutorial error.[13]

In its rebuttal, the prosecution noted defense counsel had argued Nakeya was targeting Perry by having S.P. falsify sexual abuse allegations against him. The prosecutor argued defense counsel was trying to manufacture a "Perry Mason" or "Law and Order" moment catching Nakeya in lies, and stated: "[Defense counsel] wanted to show you portions—the only audio that you didn't hear the entirety of is that one thing, those phone calls that she had with her ex-boyfriend."

Defense counsel objected and asked to approach. The trial court denied the request, then told the jury: "But ladies and gentlemen, like I indicated to you, what the lawyers say during their closing argument is not evidence. And if it's different from your own recollection of the facts, you must rely on you own recollection of the facts and not speculate whatsoever." Defense counsel asked to explain his objection at sidebar but the court denied the request, stating it could be discussed later. The prosecutor continued, stating "Nakeya explained to you on the stand the portions that you couldn't hear," and arguing the

---

[13] The trial court denied Perry's motion for new trial asserting the court had erred in ruling that only part of Nakeya's calls with Dozier was admissible.

telephone call excerpts heard at trial did not prove Nakeya was dishonest or hiding anything.

Defense counsel, without the jury present, argued the prosecutor committed misconduct by suggesting to the jury the defense failed to present the entirety of the phone calls when the prosecutor had objected to his attempt to admit the entirety of the audio into evidence.  The prosecutor responded that Nakeya explained the context of her statements made in the phone calls, including "what was not recorded or presented in the recording." The prosecutor argued she had "at no point commented that [defense counsel] somehow failed or chose not to present any evidence about the rest of that transcript," and that "to discuss what was discussed in testimony in front of this evidence after an objection was overruled is certainly not prosecutorial misconduct."  The trial court agreed, concluding:  "There was no comment whatsoever about the failure of the defense to bring on something that was not permitted to be brought in.  The exact statements had—basically was, these are the statements.  You didn't hear the rest, but [Nakeya] explains it.  And that was the extent of that statement so I do not find that there is any prosecutorial misconduct whatsoever."

As Perry explains, "The prosecutor committed error by successfully preventing the defense from presenting the entirety of Nakeya's two jail calls with Dozier and then arguing that the absence of this evidence was somehow the defense's fault."  The People argue that "[i]n making these comments, the prosecutor was arguing that counsel had taken Nakeya's words out of context, not that counsel had withheld the entire calls."  But whatever the prosecutor's intent might have been, the words used in rebuttal were that Perry's counsel "wanted to show you

40

portions" and "the only audio that you didn't hear the entirety of" was the Nakeya-Dozier calls.[14]

We conclude, however, that any such error was harmless state law error because there is no reasonable likelihood Perry would have obtained a more favorable verdict in the absence of the error. Perry's counsel directly impeached Nakeya with the key portions of the calls, and any suggestion by the prosecutor the full context of the calls might have mitigated Nakeya's impeachment is minimal and speculative in light of the entire proceeding. There was also strong evidence of Perry's guilt at trial from witnesses other than Nakeya. Further, there was no prejudice in light of the trial court's instructions to the jury that it was not to speculate why it did not hear the entirety of the calls. (*People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1268 [arguments of counsel ""generally carry less weight with a jury than do instructions from the court,"" and if they conflict we ordinarily conclude the jury followed the court's instructions]; *People v. Thomas* (2012) 54 Cal.4th 908, 940 [reiterating the "'sound presumption of appellate practice, that jurors are reasonable and generally follow the instructions they are given'"].) We conclude that any possible error was harmless, because Perry has failed to establish "'a reasonable likelihood the

---

[14] The People rely on *People v. Peterson* (2020) 10 Cal.5th 409, 465 and quote its language that it is "not misconduct for the prosecutor to argue in closing that there was no evidence supporting a particular proposition after the trial court has properly excluded evidence the defense had sought to introduce on that point." Unlike *Peterson*, the prosecutor here was not commenting on an evidentiary vacuum, but rather on the defense's purported motivation for not presenting the entirety of the Nakeya-Dozier telephone calls.

jury understood or applied the complained-of [statements] in an improper or erroneous manner.'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1205.)

We conclude there was no federal constitutional error. The rebuttal argument was a single instance that did not constitute a pattern of conduct so "'serious and egregious'" that "'the trial [was] rendered so unfair that the resulting conviction violates the defendant's right to [federal] due process of law.'" (*Daveggio, supra,* 4 Cal.5th 790 at pp. 853-854; *id.* at p. 857 ["mild and fleeting" sympathetic descriptions of victim not reasonably likely to improperly sway the jury where court instructed jury not to be influenced by sentiment or sympathy]; *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1085 ["prosecutor's fleeting misstatements of the legal standard regarding provocation were not so egregious as to amount to a denial of due process" and not part of a pattern of conduct throughout the case].)

D.    *No Cumulative Error*

Because we conclude any prosecutorial error was harmless, and, as discussed above, find no error in the other contentions on appeal, there is no cumulative error. (See *People v. Duff, supra,* 58 Cal.4th at p. 562 ["In the absence of error, there is nothing to cumulate."].)

E.    *The Trial Court's Sentence Did Not Comply with Amended Section 1170, Subdivision (b), and the Error Was Not Harmless*

Perry argues his case should be remanded for resentencing because the trial court imposed the upper terms on both counts

42

without complying with the requirements of amended section 1170, subdivision (b).  Perry's contention has merit.

### 1.  *Section 1170, Subdivision (b)*

At the time the trial court sentenced Perry in September 2021, former section 1170, subdivision (b), provided, "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court."  (Stats. 2020, ch. 29, § 14.)

Effective January 1, 2022, Senate Bill No. 567 amended section 1170, subdivision (b), to provide "(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).  [¶]  (2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.  [¶]  (3) Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (Stats. 2021, ch. 731, § 1; see *People v. Dunn* (2022) 81 Cal.App.5th 394, 401-403, review granted October 12, 2022, S275655 (*Dunn*); accord, *People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*).)

Perry contends, the People concede, and we agree Senate Bill No. 567's amendments are ameliorative changes that apply retroactively to Perry's nonfinal judgment.  (*Dunn, supra*, 81 Cal.App.5th at p. 403 ["As Senate Bill 567's amendments to section 1170, subdivision (b), lessen punishment, and there is no indication that the Legislature intended it to apply prospectively only, the new law must be retroactively applied."]; *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108 (*Zabelle*); *Lopez, supra*, 78 Cal.App.5th at p. 465*; People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

2. *The Trial Court Imposed the Upper Terms for Both Counts Without the Requisite Jury Findings or Defendant Admissions*

The trial court imposed the upper terms for both of Perry's convictions, 11 years on count 3 (forcible rape of a minor 14 years old or older) and 10 years on count 2 (sexual penetration by a foreign object of a minor 14 years old or older).  It found six circumstances in aggravation and none in mitigation, specifically:

1. "The crime involved great violence, threat of great bodily injury, and other acts disclosing a high degree of cruelty and callousness."  (Cal. Rules of Court, rule 4.421(a)(1).)
2. "[T]he victim was particularly vulnerable, a minor, his daughter, someone he exerted his authority over." (*Id.*, rule 4.421(a)(3).)
3. "[I]t did take some sophistication and planning, the escalating nature, the rewards, and then threats." (*Id.*, rule 4.421(a)(8).)

4. "[T]he defendant took advantage of the position of trust he has—had as the victim's father." (*Id.*, rule 4.421(a)(11).)

5. "[H]e was engaged in a violent conduct that indicates a seriousness—or serious danger to society." (*Id.*, rule 4.421(b)(1)).)

6. "The defendant's . . . prior convictions are numerous and increasing in seriousness," although the court noted that Perry had a period of no criminal history from 2002 until the present events. (*Id.*, rule 4.421(b)(2).)

The trial court also considered the probation officer's report listing Perry's prior convictions.

Perry did not stipulate to and the jury did not find beyond a reasonable doubt the facts underlying any of the aggravating circumstances. (*People v. Ross* (2022) 86 Cal.App.5th 1346, 1353, review granted Mar. 15, 2023, S278266 (*Ross*) [imposition of upper term based on trial court's findings on aggravating factors erroneous under amended section 1170, subdivision (b)]; *Zabelle, supra,* 80 Cal.App.5th at pp. 1109-1111 ["the trial court's imposition of the upper term based on its own factfinding violated defendant's rights under the Sixth Amendment" and section 1170, subdivision (b)].) Perry also argues the probation officer's report is not a "certified record of conviction" within the meaning of section 1170, subdivision (b)(3). (*Dunn, supra,* 81 Cal.App.5th at p. 401 ["a probation report is not a certified record of conviction"].) And the People concede the prosecution did not provide certified copies of Perry's prior convictions. As

45

such, the trial court's sentence did not comply with amended section 1170, subdivision (b).

As the parties note, there is a split of authority regarding the applicable prejudice standard when determining whether a case should be remanded for resentencing under amended section 1170, subdivision (b).  Our Supreme Court granted review in *People v. Lynch* (May 27, 2022, C094174) [nonpub. opn.], review granted August 10, 2022, S274942, to decide the matter. Until the high court resolves the issue, we apply the two-step harmless error test set forth in *Zabelle, supra,* 80 Cal.App.5th at pages 1111 to 1112 and the related approach in *Lopez, supra,* 78 Cal.App.5th at pages 465 to 467.[15]

First, we evaluate whether the Sixth Amendment error is harmless under the *Chapman* standard as formulated by *People v. Sandoval* (2007) 41 Cal.4th 825, 839: "'[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless.'" (*Zabelle, supra,* 80 Cal.App.5th at p. 1111.)  Second, we apply the *Watson* harmless-error standard to evaluate state law error by considering "whether it is reasonably probable that the trial court would have chosen a lesser sentence in the absence of the error."

---

[15]     The parties also cite *Dunn, supra,* 81 Cal.App.5th at pp. 409-410.  *Dunn*'s analysis is similar to that of *Lopez*, but the court in *Dunn* was "unconvinced that the *Chapman* standard of harmless error . . . must be applied to *all* aggravating circumstances in the *Lopez* court's first step" and it applied a rule modifying that step to incorporate *Watson*.  (*Id.* at p. 408.)

(*Id.* at p. 1112.)  As *Zabelle* explained, "Resolving this issue entails two layers of review.  We must first, for each aggravating fact, consider whether it is reasonably probable that the jury would have found the fact not true.  We must then, with the aggravating facts that survive this review, consider whether it is reasonably probable that the trial court would have chosen a lesser sentence had it considered only these aggravating facts." (*Ibid.*)

Applying the two-step harmless error analysis to Perry's case, we conclude remand for resentencing is warranted.  On this record, we cannot conclude beyond a reasonable doubt that the jury would have found beyond a reasonable doubt at least one aggravating circumstance had the circumstance been submitted to the jury.  (*Zabelle*, *supra*, 80 Cal.App.5th at pp. 1111-1112.)  As noted above, one of the six aggravating circumstances cited by the trial court, Perry's history of prior convictions, was not supported by a certified record of conviction.  (§ 1170, subd. (b)(3); *Dunn, supra,* 81 Cal.App.5th at p. 410.)  And the other five— great violence and high degree of cruelty and callousness, the particular vulnerability of the victim, sophistication of the crime, taking advantage of a position of trust, and violent conduct indicating serious danger to society—all involve "vague or subjective standard[s]" requiring "an imprecise quantitative or comparative evaluation of the facts" such that it is "difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court."  (*Sandoval, supra,* 41 Cal.4th at p. 840.)  We also cannot "assume that the record reflects all of the evidence that would have been presented had aggravating circumstances been submitted to the jury."  (*Id.*

47

at p. 839.)  Likewise, the state law error was not harmless under *Watson* because we cannot conclude the trial court "*would* have imposed the upper term sentence even absent the error." (*Zabelle*, at p. 1112.)

The People argue the jury could have found two aggravating circumstances true beyond a reasonable doubt. First, that "the victim was particularly vulnerable, since she was a minor and appellant's daughter" because the jury "necessarily found that both crimes involved a child."  Second, "that appellant took advantage of a position of trust as S.P.'s father."  But even if the jury could have found either of these two aggravating circumstances true beyond a reasonable doubt, the trial court did not weigh any factor against the others, leaving us to speculate about the impact fewer aggravating factors may have had on its decision-making.  (*Lopez, supra,* 78 Cal.App.5th at p. 468 [remand required where trial court relied on "long list" of aggravating factors but gave no indication what decision it would make if fewer factors were available].)  Overall, we cannot say with certainty how the court would have assessed fewer aggravating factors.

Accordingly, we vacate the sentence and remand for the trial court to resentence Perry under amended section 1170, subdivision (b).  On remand, "full resentencing" is warranted, including applicable retroactive changes in the law.  (See *People v. Jones* (2022) 79 Cal.App.5th 37, 46 ["the need to apply amended sections 1170, subdivision (b) and 654 creates sufficiently "'changed circumstances'" [citation] to warrant a full resentencing"]; *People v. Garcia* (2022) 76 Cal.App.5th 887, 902 ["the trial court may revisit all of its sentencing choices in light of" the amendments to section 1170, subdivision (b)].)

## DISPOSITION

The convictions are affirmed.  We vacate the sentence and direct the trial court to resentence Perry in accordance with section 1170, subdivision (b), and any other applicable ameliorative legislation.


MARTINEZ, J.

We concur:


PERLUSS, P. J.


SEGAL, J.